United States Court of Appeals,

Fifth Circuit.

No. 92-1978.

RESOLUTION TRUST CORPORATION, In its Corporate Capacity, Plaintiff,

v.

H.R. "BUM" BRIGHT, et al., Defendants-Appellees,

Hopkins & Sutter, Peter F. Lovato III and Thomas D. Graber, Appellants.

Nov. 9, 1993.

Appeal from the United States District Court for the Northern District of Texas.

Before JONES and DeMOSS, Circuit Judges, and KAZEN, District Judge.[1]

KAZEN, District Judge:

This appeal arises out of a lawsuit filed in May 1992 by the Resolution Trust Corporation ("RTC") against H.R. "Bum" Bright and James B. "Boots" Reeder, based on their alleged misconduct in connection with activities at Bright Banc Savings Association, Dallas ("Bright Banc"). Approximately two months after the suit was filed, appellees moved for a protective order and sanctions against the RTC for the manner in which its attorneys, Peter F. Lovato III and Thomas D. Graber, interviewed a former Bright Banc employee. After four days of hearings on the motion for sanctions, the district court issued an oral order on October 19, 1992, finding that the attorneys, appellants herein, impermissibly attempted to persuade the witness to sign an affidavit containing statements which the witness had not previously told appellants. The order disbarred the attorneys from practicing before the district judge and disqualified the attorneys' law firm, Hopkins & Sutter, from further representing RTC in the underlying case. In a December 28, 1992 written order, the court assessed attorneys' fees against the law firm for costs incurred by appellees in prosecuting the sanctions motion.[2] Appellants timely appealed the district court's decision. We reverse.

---

[1]District Judge of the Southern District of Texas, sitting by designation.

[2]Because appellants' Notice of Appeal had already been filed when the district court issued its opinion, the court stayed the operation of the award of attorneys fees pending disposition of the appeal.

A. *Factual Background*

On May 14, 1992, the RTC filed suit in federal district court charging appellees Bright and Reeder, as shareholders, directors and officers of Bright Banc, with fraud, negligence, and breach of fiduciary and other duties owed to the bank's shareholders. As part of their pre-filing investigation of the case, attorneys Lovato and Graber conducted several interviews—all voluntary—with Barbara Erhart, formerly the Senior Vice President of Finance Support at Bright Banc. Erhart had worked closely with defendant Reeder and had contact with defendant Bright on "critical matters."

The primary focus of the Erhart interviews was the method Bright Banc used to calculate the amount of non-cash assets it had converted to cash for a December 1986 report on the bank's financial health to the Federal Home Loan Bank Board ("FHLBB"). The RTC attorneys, including Lovato and Graber, questioned Erhart extensively about who made and authorized the computations used in the report. At the conclusion of the third interview, Lovato and Graber asked Erhart to return to their office the next day—April 9, 1992—to review and sign an affidavit summarizing what she had told them in the course of the prior interviews.

When Erhart arrived at the office of Hopkins & Sutter on April 9th, she was not immediately given the affidavit. Instead, the attorneys questioned her again about the cash conversion calculations. As Lovato and Graber spoke to Erhart, they made some last-minute changes to the draft. The changes were incorporated into a revised draft which Graber then presented to Erhart. He warned her that it "contained a couple of things [they hadn't] discussed with [her]," but which the attorneys nevertheless believed to be true. Erhart was instructed to read the affidavit "very carefully."

Erhart made several changes to the draft affidavit. Some related only to semantical differences, while others reflected Erhart's disagreement with substantive claims in the affidavit. Lovato and Graber questioned Erhart extensively about the changes she made. During this questioning, the attorneys asked Erhart whether she could reword some of her changes to emphasize that Bright and Reeder were more directly involved in the decision to use the controversial cash conversion computations. Erhart declined because she did not have personal knowledge of the statements the attorneys wanted her to include in her affidavit. With respect to some of the

statements in the affidavit, the attorneys were not content to accept Erhart's initial refusal to revise her changes. In an effort to have Erhart see things their way, Lovato and Graber described their understanding of how certain events transpired at Bright Banc, presented Erhart with independent evidence to support this interpretation of events, and aggressively challenged some of Erhart's assumptions about Bright and Reeder. After making their case for further revisions, Lovato and Graber asked Erhart whether she believed them and whether she was now convinced that their version of certain events was correct. Erhart, unconvinced, declined to alter the initial changes she had made to the draft affidavit.

When it was clear to the attorneys that Erhart would not sign a statement agreeing with the attorneys' version of some of the disputed events at Bright Banc, they incorporated Erhart's handwritten changes into a new draft affidavit. Erhart read this draft and made a few changes which were then included in a third draft. Erhart read and approved this version of the affidavit, signed it and left the offices of Hopkins & Sutter.

Approximately one month later, Erhart told appellees' attorneys that she had given a statement to appellant-attorneys regarding some of the transactions at issue in the underlying law suit. Appellees' counsel then arranged for Erhart to give them an *ex parte* statement on June 12, 1992 about her meetings with Lovato and Graber. This statement was transcribed by the court reporter but never signed by Erhart. However, she later adopted portions of it during testimony before Judge Kendall on August 9, 1992.

In that testimony, Erhart stated, among other things, that she did not think Lovato and Graber were asking her to say something she did not believe but rather were trying to determine if she could see the case the way they did. She denied being harassed or intimidated and expressed the view that "they were doing their job, just like everybody else." The district court essentially disregarded this testimony, finding it contrary to Erhart's earlier *ex parte* statement given to appellees' attorneys, and concluding that the change must have been the result of "obvious job pressure." Erhart's earlier statement clearly has a different tone from her subsequent court testimony. For example, she earlier described Lovato as having been particularly aggressive in attempts to persuade her to agree with

appellants' version of certain events, "almost like browbeating me." Nevertheless even in her *ex parte* statement, Erhart indicated that Lovato and Graber were not trying to have her change facts but rather to agree with a different "interpretation" or "slant" from the facts.

B. *The Motion For Sanctions*

On July 15, 1992, Bright and Reeder moved for sanctions and a protective order against the RTC based on Lovato and Graber's conduct during the Erhart interviews. The motion alleged that the manner in which the RTC's attorneys interviewed Erhart violated Texas Disciplinary Rules of Professional Conduct 3.04, 4.01(a) and 4.04(a) and probably violated 18 U.S.C. §§ 1503, 1512. Appellees also called upon the court to exercise its "inherent powers" to sanction the RTC for intimidating Erhart. The motion asked the court to prevent the RTC from using any notes or statements obtained through the Erhart interviews, to order the RTC not to make any further contact with Erhart, and to award attorneys fees to Bright and Reeder for their efforts in bringing and prosecuting the motion for sanctions.

On July 20, 1992, the district court ordered that both sides refrain from contacting Erhart while the sanctions motion was pending. Hearings on the sanctions motion were held over the course of several days from August to October 1992.

C. *The District Court's Decision*

The district court issued an oral ruling on the motion for sanctions on October 19, 1992. This ruling was further clarified in separate written orders issued on October 23 and December 28, 1992.

The court found that Lovato and Graber "knowingly attempted to get a key witness ... to commit to a sworn statement that they knew contained assertions of fact she had not made or told them previously in matters highly relevant to the plaintiff's civil claim." It found that the attorneys were "going to try to talk her into" those statements. The Court was particularly troubled because the draft affidavit given to Erhart added matters only in areas "that established or buttressed the [RTC's] claims." The court characterized the attorneys' actions concerning the draft affidavit as "tampering with" or attempting to "manufacture" evidence to "cause, or aid in, Defendants' downfall."

Based on its inherent power to regulate the conduct of attorneys, Judge Kendall disbarred

Lovato and Graber from practicing before him. He assessed $110,000 in attorneys fees against Hopkins & Sutter for expenses incurred by Bright and Reeder in the prosecution of the sanctions motion.[3] Pursuant to its authority under Local Rule 13.2 (N.D.Tex.),[4] the court removed Hopkins & Sutter from further representing the RTC in the underlying action. Finally, it ordered the firm not to charge the RTC for defending against the sanction motion. No sanctions were assessed against the RTC. Lovato, Graber and Hopkins & Sutter timely appealed.[5]

D. *Disbarment* of Lovato and Graber

The district court disbarred attorneys Lovato and Graber from practicing before it pursuant to the court's inherent powers to discipline attorneys. It is beyond dispute that a federal court may suspend or dismiss an attorney as an exercise of the court's inherent powers. *In re Snyder,* 472 U.S. 634, 643-644, 105 S.Ct. 2874, 2880, 86 L.Ed.2d 504 (1985); *Matter of Thalheim,* 853 F.2d 383, 389 (5th Cir.1988). However, before sanctioning any attorney under its inherent powers, the court must make a specific finding that the attorney acted in "bad faith." *Thalheim,* 853 F.2d at 389. The United States Supreme Court has held that a court's imposition of sanctions under its inherent powers is reviewable under the abuse-of-discretion standard. *Chambers v. NASCO, Inc.,* --- U.S. ----, ----,

---

[3]The court explained that the award of attorneys fees was not intended as a sanction, but that it "flows from equity in light of the Court's inherent power or the purpose of reimbursement rather than sanction." December 28, 1992 Order at 3 n. 1.

[4]Local Rule 13.2 of the U.S. District Court For the Northern District of Texas states, in pertinent part,

> Any member of the bar of this Court ... who proves to be incompetent to practice before this Court because of unethical behavior ... is subject to revocation of admission to practice in this District and to other appropriate discipline, after such hearing as the Court may direct in each particular instance.

[5]The notice of appeal purports to appeal all sanctions imposed in the Order of December 28, 1992. However, an order disqualifying counsel in a civil case is not a final judgment on the merits of the litigation and does not fall under the "collateral order" exception. *Richardson-Merrell, Inc., v. Koller,* 472 U.S. 424, 430, 105 S.Ct. 2757, 2761, 86 L.Ed.2d 340 (1985). Appellants' brief generally attacks the "sanctions" imposed by the trial court but does not specifically mention the disqualification order. Their Statement of Jurisdiction refers to counsel "who have perforce withdrawn from the case." Appellees' Statement of Jurisdiction asserts that appellants "have not attempted to appeal from that portion of the order disqualifying them as counsel to the RTC." Appellants have not challenged that assertion. We conclude that the disqualification sanction is not before us on this appeal. The remaining three sanctions are ripe for appeal. *Markwell v. County of Bexar,* 878 F.2d 899 (5th Cir.1989).

111 S.Ct. 2123, 2138, 115 L.Ed.2d 27 (1991). A court abuses its discretion when its ruling is based on an erroneous view of the law or on a clearly erroneous assessment of the evidence. *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 405, 110 S.Ct. 2447, 2461, 110 L.Ed.2d 359 (1990). In the specific context of a disqualification motion, this circuit reviews fact findings for "clear error" while "carefully examining" the district court's application of relevant ethical standards. *In re American Airlines, Inc.,* 972 F.2d 605, 609 (5th Cir.1992), *cert. denied* --- U.S. ----, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993).

Because disbarment is a quasi-criminal proceeding, any disciplinary rules used to impose this sanction on attorneys must be strictly construed, resolving ambiguities in favor of the person charged. *Thalheim,* 853 F.2d at 388. The Texas Disciplinary Rules of Professional Conduct do not expressly apply to sanctions in federal courts, but a federal court may nevertheless hold attorneys accountable to the state code of professional conduct. *See In re Snyder,* 472 U.S. at 645 n. 6, 105 S.Ct. at 2881 n. 6; *In re Finkelstein,* 901 F.2d 1560, 1564 (11th Cir.1990).

The district court failed to make specific findings of how appellants violated the Disciplinary Rules. In its oral findings, the court concluded that Lovato and Graber engaged in "inappropriate conduct, conduct that probably violates the DRs, unethical conduct, as well as a probable violation of the obstruction of justice statutes." We shall assume that the district court's comments referred to the Disciplinary Rules invoked by Appellees in their motion for sanctions.

The sanctionable conduct found by the district court was the attorneys' inclusion of statements in draft affidavits that had not been previously discussed with Erhart, combined with the attorneys' attempts to persuade Erhart to agree with their understanding of how certain events transpired at the bank. Placing statements in a draft affidavit that have not been previously discussed with a witness does not automatically constitute bad-faith conduct. *See U.S. v. Brand,* 775 F.2d 1460, 1469 (11th Cir.1985) (giving witness affidavit with statements not previously discussed not obstruction of justice). It is one thing to ask a witness to swear to facts which are knowingly false. It is another thing, in an arms-length interview with a witness, for an attorney to attempt to persuade her, even aggressively, that her initial version of a certain fact situation is not complete or accurate.

Disciplinary Rules 3.04(b) and 4.01(a) concern the former circumstance, not the latter. The district court never found that appellants asked Erhart to make statements which they knew to be false. Indeed, the district court pretermitted any consideration of the truth of the draft affidavits. Appellees nevertheless argue that because appellant attorneys attempted to persuade Erhart to adopt certain statements which she had not expressly made and which she refused to adopt, the attorneys thereby were either making or urging the making of "false" statements in violation of DRs 3.04(b) and 4.01(a). We disagree. The district court characterized the attorneys' behavior as "manufacturing" evidence, but there is no indication that the attorneys did not have a factual basis for the additional statements included in the draft affidavit. *See Koller v. Richardson-Merrell,* 737 F.2d 1038, 1058-59 (D.C.Cir.1984), *vacated on other grounds* 472 U.S. 424, 105 S.Ct. 2757, 86 L.Ed.2d 340 (1985). On the contrary, appellants have attempted to demonstrate in a detailed chart that the contested portions of the affidavit were based either on their notes of interviews with Erhart or on evidence from other sources (e.g., internal bank memorandum).

We recognize that the Texas Disciplinary Rules are not the sole authority governing a motion to disqualify in federal court; rather, such a motion must be determined by standards developed under federal law. *In re Dresser Industries, Inc.,* 972 F.2d 540, 543 (5th Cir.1992). Our source for professional standards has been the canons of ethics developed by the American Bar Association. *Id.* The district court opinion, however, makes no reference to any national canons which would add to the analysis here, nor do appellees. A court obviously would be justified in disbarring an attorney for attempting to induce a witness to testify falsely under oath, *see Thalheim,* 853 F.2d at 390 (citing *U.S. v. Friedland,* 502 F.Supp. 611, 619 (D.N.J.1980), *aff'd.* 672 F.2d 905 (3d Cir.1981)), but this record does not support the conclusion that Lovato and Graber engaged in such behavior. While the attorneys were persistent and aggressive in presenting their theory of the case to Erhart, they nevertheless made sure that Erhart signed the affidavit only if she agreed with its contents. The attorneys never attempted to hide from Erhart the fact that some statements were included in draft affidavits that had not been discussed with her previously. Instead, they brought the statements to her attention and warned her to read them carefully. Additionally, Lovato and Graber never claimed

to be neutral parties. Erhart knew that these attorneys were advocates for a particular position, and she was also in communication with attorneys who were advocating the contrary position. Were Erhart giving testimony at a deposition or at trial, the attorneys for either side would not be required to accept her initial testimony at face value but would be able to confront her with other information to challenge her testimony or attempt to persuade her to change it.

Appellees also alleged that RTC attorneys violated Disciplinary Rule 4.04(a), which prohibits an attorney from burdening a third party without a valid "substantial purpose" or violating a third party's legal rights. The district court findings do not reveal that Lovato and Graber committed either wrong. The attorneys' sometimes laborious interviews with Erhart were conducted with the goal of eliciting an accurate and favorable affidavit from a key witness in the underlying case. Additionally, the district court made no findings that the interviews violated Erhart's legal rights, nor does the record contain any evidence to support such a finding.

*E. Sanctions Against The Law Firm*

The district court ordered the firm of Hopkins & Sutter to pay $100,000 in attorneys' fees to appellees for their prosecution of the sanction motion and also restrained the firm from charging the RTC for defending against the motion. The court assessed attorneys' fees under its inherent power to do so against counsel who have conducted themselves "in bad faith." *Chambers,* --- U.S. at ----, 111 S.Ct. at 2133. It found that Lovato and Graber acted in bad faith because they tampered with or attempted to manufacture evidence and concluded that "a law firm may not escape the consequences of misconduct committed by one of its attorneys." The Supreme Court in *Chambers* described three exceptions to the so-called "American Rule," which prohibits fee shifting in most cases. The exception pertinent to the instant case is that a court may assess attorney's fees when a party acts "in bad faith, vexatiously, wantonly, or for oppressive reasons." --- U.S. at ----, 111 S.Ct. at 2133. The Supreme Court compared this exception to the requirement under Rule 11, Fed.R.Civ.P., providing that the signer of a paper warrants that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. *Id.* at n. 10. We understand the district court's finding of "bad faith" to be grounded exclusively on

the proposition that attorneys Lovato and Graber wrongfully tried to tamper with or manufacture evidence. Because we have already found that the record does not support that conclusion, the assessment of attorney's fees cannot be sustained.

The trial court did not elaborate, either orally or in writing, on its order restraining Hopkins & Sutter from charging the RTC for time spent defending the motion for sanctions. Neither side has specifically addressed that sanction on appeal. Nevertheless, in view of the conclusions we have heretofore announced, there would likewise be no justification for this sanction.

*F. Conclusion*

We conclude that the district court abused its discretion when it issued its sanctions ruling against appellants.[6] We REVERSE and REMAND for proceedings not inconsistent with this opinion.

---

[6]Appellants advance several additional grounds for the reversal of the district court's decision, including due process violations and an impermissible *ex parte* contact between the district court judge and an FBI agent. We need not reach these issues.