**Mrs. E. Claire KNOX and Katherine Carroll as Administratrix of the estate of Lucinda Knox, Plaintiffs,**

**v.**

**Nathaniel HAYES, Roland's Bonded Warehouse, Inc., Providence Washington Insurance Co., and Continental Casualty Co., Defendants.**

Civil Action No. 494–147.

United States District Court,
S.D. Georgia,
Savannah Division.

April 24, 1995.

Christopher L. Rouse, Steven Elliot Scheer, Ralph Jonathan Hart, Lee, Black, Scheer & Hart, P.C., Savannah, GA, for plaintiffs.

Frank C. Jones, Michael Eric Ross, King & Spalding, Atlanta, GA, for Frank W. Seiler, et al.

Frank C. Jones, King & Spalding, Atlanta, GA, William Pierce Franklin, Jr., Inman Gregory Hodges, Oliver, Maner & Gray, Savannah, GA, Walter Charlton Hartridge, II, Joseph A. Mulherin, III, Frank Wilkens Seiler, Bouhan, Williams & Levy, Savannah, GA, Michael Eric Ross, King & Spalding, Atlanta, GA, Richard A. Rominger, Edward Reidar Stabell, III, Brennan, Harris & Rominger, Savannah, GA, Hall F. McKinley, III, Drew, Eckl & Farnham, Atlanta, GA, Kenneth August Hindman, Drew, Eckl & Farnham, Atlanta, GA, Molly M. Howard, Wayne Stephen Racz, Howard & Racz, Savannah, GA, David

Royce Smith, Brannen Searcy & Smith, Savannah, GA, for Hayes, et al.

### ORDER

EDENFIELD, Chief Judge.

Pursuant to this Court's order of March 23, 1995, a disciplinary hearing was held on April 5, 1995, on allegations of discovery abuse and unethical conduct by counsel for Defendants Nathaniel Hayes ("Hayes") and Roland's Bonded Warehouse ("Roland's"). The Court has not allowed the case to proceed pending resolution of this matter. Specifically, the attorneys implicated are Frank W. Seiler and Joseph A. Mulherin, III, both of the law firm Bouhan, Williams & Levy. Pending before the Court is a second motion to strike by Plaintiffs and various other motions, including objections and motions for reconsideration of orders issued by Magistrate Judge G.R. Smith.

For reasons discussed below, the Court finds that both men should be disciplined for misconduct in litigating the above-styled case; a summary of the sanctions imposed is in the Conclusion to this order.[1]

## I. BACKGROUND

The Court makes no findings of fact about the unfortunate accident prompting this suit. The following recitation is provided only as an introduction to the matter at hand.

On March 5, 1994, Lucinda Knox, a student at the Savannah College of Art & Design, was pedalling her bicycle north on Martin Luther King Boulevard just south of its intersection with Bay Street. Defendant Hayes, driving a tractor-trailer rig in his capacity as a driver for Defendant Roland's, was also proceeding north on Martin Luther King. Ms. Knox was to the right of the truck. As both parties reached the intersec-

tion, Ms. Knox continued across Bay Street, but Mr. Hayes attempted to make a right turn. As Mr. Hayes turned in front of the bicycle it collided with the rear right side of the truck. The bicycle and Ms. Knox were run over by the rear wheels and crushed. Ms. Knox was pronounced dead at the scene.

This suit was filed on June 24, 1994.

## II. FINDINGS

The disciplinary proceedings involved two broad issues: defense counsel's conduct regarding compliance with Plaintiffs' discovery requests for Hayes' driving record, and defense counsel's conduct in procuring and using the affidavit of David Higgs, a witness to the accident. Plaintiffs' attorney, Steven E. Scheer, argues that Messrs. Mulherin and Seiler repeatedly dodged disclosing the driving record and intentionally deceived him about its contents. Mr. Scheer also accuses Mr. Seiler of securing a false affidavit from Mr. Higgs and then using the affidavit in this litigation without informing Mr. Scheer or the Court of material misstatements therein.

### A. The Driving Record

Mr. Scheer's allegations of discovery abuse regarding Hayes' driving record and Defendants' responses thereto were thoroughly reviewed by Magistrate Judge G.R. Smith, who held a hearing on the matter and issued an order. *See* Magistrate's Order of Nov. 23, 1994. As Messrs. Hartridge and Seiler argued at the disciplinary hearing, because the matter was a pre-trial one and the Magistrate did not grant a sanction disposing of the case, the Magistrate was authorized to issue an order, as opposed to a report and recommendation. This Court reviews such orders under a "clearly erroneous" standard.[2] *See* 28 U.S.C.

---

1. In considering this matter the Court has reviewed the entire record, including all prior submissions, the most recent proposed findings of the parties, and the transcripts of the November 7, 1994, motions hearing before Magistrate Judge Smith, the March 7, 1995, status conference held by this Court, and the April 5, 1995, disciplinary hearing. The Court has also reviewed the depositions and affidavits in this case.

2. Federal Rule 72 makes explicit a distinction implied in 28 U.S.C. § 636(b)—that Magistrates have authority to issue orders on "nondispositive" motions, but not "dispositive" ones. Congress sought to avoid granting Magistrates, who are not Article III judges, the power to dispose of cases in their entirety without plenary district court review. *See* 7 Moore's Federal Practice ¶ 72.04[1]. This goal is accomplished in § 636(b) by preventing Magistrates from issuing orders on summary judgment motions, motions

§ 636(b)(1)(A); Fed.R.Civ.Proc. 72; 7 Moore's Federal Practice 72.04[2.–4].

After reviewing every one of the absurd number of motions filed with the Magistrate on the issue of Defendant Hayes' driving record, and all of the objections filed thereafter, the Court is left with the distinct impression that Defendants did more than merely "drop the ball." The Court finds intentional obstruction by the Defendants, as evidenced by various aspects of the record. For example:

**1.**

It is clear to the Court that Plaintiffs' initial interrogatory, though broad in demanding information dating back fifteen years, contemplated not only officially documented evidence of Hayes' driving past but the personal knowledge of each Defendant (and defense attorney). Defendants' lawyers, in their pleadings and interactions with opposing counsel, stubbornly insisted on a narrower reading, and this Court believes

they did so to avoid disclosing citations against Hayes for driving under the influence of alcohol three times in the past sixteen months. They compounded their error by intentionally misreading the Magistrate's explicit discovery order of September 16, 1994, which required all Defendants to disclose any information pertaining to Hayes' driving record. This misreading—that Plaintiffs and the Magistrate wanted only official records of Hayes' driving past and no other information, including personal knowledge—underlay Defendants' arguments from the filing of the Magistrate's first discovery order to the present day. The argument is no more convincing now than it was then.

**2.**

Defense counsel's "certificate of compliance" with the Magistrate's discovery order also demonstrates intentional avoidance of disclosure. It conspicuously omits to acknowledge that Hayes himself saw the order or that he had relinquished any relevant

for involuntary dismissal, and six other potentially dispositive matters. In those instances a Magistrate may only make a report and recommendation open to *de novo* review by the district court.

Neither § 636(b) nor Federal Rule 72 mention the proper standard of review for motions to strike defendants' answers. What few courts have dealt with the issue have ruled that reviewing courts should focus on whether the Magistrate actually disposed of the case, i.e., struck the defendant's answers, to determine the correct standard of review. *See, e.g., Ocelot Oil Corp. v. Sparrow Industries*, 847 F.2d 1458, 1462, 1462–64 (10th Cir.1988). *See also Thomas Hoar v. Sara Lee Corp.*, 900 F.2d 522, 525 (2d Cir.1990); 7 Moore's Federal Practice ¶ 72.04[2.–4]. Under these decisions, only if the Magistrate did in fact dispose of the case is the *de novo* standard appropriate; if he imposed any lesser sanction, because discovery matters are "pre-trial matters," the deferential "clearly erroneous" standard should apply. In short, the standard of review is determined not by what the movant demanded, but by what the Magistrate decided to grant.

The Court doubts whether this approach is correct. It appears to have originated with the *Ocelot* court; Moore's then adopted the approach and cited *Ocelot* as its sole authority. Later courts then relied on Moore's for guidance. *See, e.g., Thomas Hoar*, 900 F.2d at 525; *Associates Financial Services Co., Inc. v. Mercantile Mortgage Co.*, 727 F.Supp. 371, 375 (N.D.Ill. 1989). The problem with the standard is that it does not comport with how Congress chose to handle those motions that are specifically enumerated in § 636(b). For example, it is agreed that a Magistrate may hear a motion for summary judgment, but *whether he grants it or not*, he may only file a report and recommendation, and not an order. That rule should apply here, as well. A motion for the sanction of striking defendants' answers is obviously potentially dispositive and essentially a motion for involuntary dismissal. Motions to "involuntarily dismiss an action" are specifically listed in 28 U.S.C. § 636(b) among those eight matters on which Magistrates may not rule.

A Magistrate's denial of a dispositive motion does not render that motion any less significant or appropriate for full district court review. There is no evidence in § 636 or Rule 72 supporting the distinction made in *Ocelot;* those provisions refer only to "matters," not "rulings." The *Ocelot* standard also unfairly prejudices those filing dispositive discovery motions before a Magistrate: If such a motion is granted, the district court reviews the grant *de novo*, and so is more likely to change it. If the motion is denied, the district court can only disturb that ruling if it is found clearly erroneous. Movants have as much of a right to be free of inappropriate litigation and discovery abuses as nonmovants do to remain in suit. All potentially dispositive matters should be fully reviewed by an Article III judge, not only those in which the Magistrate has granted movants the full relief requested.

In this case the Court will defer to the weight of authority. It has found no case supporting the interpretation of § 636 and Rule 72 suggested here.

information in his possession.[3] It is also carefully worded to stay within the Defendants' narrow construction of the discovery order's terms. Meanwhile, Plaintiffs had notified Defendants by letter that they sought personal knowledge of Hayes' record. Also, during this time Hayes himself was driving on a DUI citation. He surely did not forget about it. One of three things happened: a) defense counsel never asked him about it; b) he never told them about it; or c) defense counsel chose not to disclose it.[4]

None of these possibilities is acceptable to the Court. In light of correspondence in the record, it appears that Messrs. Mulherin and Seiler asked Defendant Roland's to ask Hayes about his driving past, never verified that this was actually done, never received an answer from Hayes or Roland's, and then told Mr. Scheer that because they had not received an answer, it was safe to assume that Hayes had nothing to provide beyond that contained in his official driving records.

This behavior amounts to fairly blatant avoidance of a simple discovery request, a conclusion only buttressed by the affidavit defense counsel later secured from Defendant Hayes on this subject. In it, Hayes too, surely with the assistance of his attorneys, implores the Court to believe that, far from acting in bad faith, he just did not think the Magistrate's discovery order covered any driving citations that were not indelibly carved into the official records of the State of Georgia. He claims to have forgotten about a DUI conviction in 1985. As for his acquittal on a DUI charge in April, 1993, because the charge never entered The Driving Record, he did not think he had to disclose it to

Plaintiffs. The Court is asked to accept this excuse in the face of the Magistrate's explicit discovery order, which said that Defendants were to "provide any information they have *pertaining to* the driving record of Defendant Nathaniel Hayes." "Driving record," the Magistrate took the time to say, meant *"all motor vehicle or driving charges and/or crimes* made or pending against Nathaniel Hayes...." This is simple English that would lead a reasonable person to conclude that the Magistrate intended Defendants to divulge information about drunk driving charges—acquittal or no. Those acting out of a professional obligation of good faith would even more surely so conclude.

As for his August, 1993, DUI charge, Hayes once again pleaded that because it never entered the pages of The Driving Record, this charge, too, was not disclosed. And as for his June, 1994, DUI charge, Hayes—more likely his counsel—consistent to the bitter end, this time claimed that because the charge was so recent and not yet resolved in court, it clearly could not be part of The Driving Record, and thus, it was not disclosed.

**3.**

Defendants offer of a joint *in camera* review of relevant driving records, while seemingly in good faith, once again conveniently avoided an accounting for the personal information Mr. Scheer sought in the first place. As all parties acknowledge, the official records Mr. Scheer could have gotten for himself (and did). What he needed from Defendants was what Hayes, Roland's Warehouse,

---

3. The certificate reads, for example: "The Court's Order of September 16, 1994 has been provided directly to Roland's Bonded Warehouse, Inc. and Providence Washington Insurance Company, and they have read and acknowledged it."

4. At the disciplinary hearing, Mr. Mulherin argued that "it never occurred to [him]" to ask Mr. Hayes about past DUI citations. He then stated that Mr. Denmark, of Roland's Warehouse, had also asked Hayes "what else is there. And it boils down to those three DUI citations, the two before and the one after [the accident]." Hearing Trans. at 37. The Court does not doubt that defense counsel either was aware of the DUI citations when they responded to Mr. Scheer's

various discovery requests, or had made themselves willfully blind to them by simply not asking Hayes about it and not averring in their "certificate of compliance" that Hayes had seen the Magistrate's order and complied with it.

The Court is not impressed with defense counsel's excuse that they could not get the necessary information from Mr. Hayes because he is "illiterate," Hearing Trans. at 47, and generally uneducated. The man can obviously communicate in English and is fully capable of remembering what has happened to him in the recent past. He may be ignorant, but he is not mentally deficient. His lack of education does not absolve counsel of any professional obligations.

and Providence Washington Insurance themselves knew about Hayes' past as a driver.

After mulling the Magistrate's order of November 23, 1994, however, this Court cannot say that the Magistrate's findings were clearly erroneous.[5] His factual recitation is accurate, and while this Court is deeply disappointed by Defendants' and their attorneys' misconduct, the evidence of bad faith is not so egregious that it supports reversing the Magistrate under the deferential "clearly erroneous" standard. It is clear to the Court that Defendants and their counsel first stubbornly argued for a narrow—and obviously inaccurate—reading of Mr. Scheer's initial interrogatory and then the Magistrate's September 16 order, and then later switched tactics and argued that Hayes never fully disclosed his past to his lawyers or that counsel failed to ask him exactly the right questions in the first place.

While the Court finds these tactics unprofessional, it agrees with the severity of the sanctions imposed in the Magistrate's November 23 order: the striking of answers is not appropriate, but an award of fees and costs certainly is. The Court affirms that award, but modifies it thus: There is insufficient evidence in the record to hold Providence Insurance Company itself responsible for the discovery abuses involving Hayes' driving record, and so the Court holds that Providence need not pay any share of the fees or costs awarded by Magistrate Smith. That burden will be borne, specifically, jointly, and severally, by Mr. Mulherin, Mr. Seiler, Mr. Hayes, and Roland's Bonded Warehouse.

Mr. Scheer submitted an accounting of attorneys' fees for himself and his colleague, Mr. Rouse, with the Court on December 5, 1994. It amounts to $7,416,00. After examining counsel's submission, the Court finds this amount appropriate, and it is hereby awarded.

All other remaining objections to the Magistrate's November 23, 1994, order and motions for reconsideration of it, whether by Plaintiffs or Defendants Hayes, Roland's, or Providence, are hereby **DENIED**.[6]

## B. The Higgs Affidavit

■ Mr. Scheer also alleges that Mr. Seiler acquired and sought to use an affidavit that he knew to contain material falsehoods. That affidavit is the first one given by David Higgs, a witness to the accident involving Mr. Hayes and Ms. Knox. Mr. Higgs gave a copy of the affidavit to Mr. Scheer before his deposition, during which Higgs testified that the affidavit did not accurately reflect his recollections of the accident. Mr. Scheer, believing Mr. Seiler had intentionally secured an affidavit that he knew to be inaccurate, accused him of just that. This accusation was the primary reason for the Court's hearing.

### 1. Facts

#### Mr. Seiler's Version

At the disciplinary hearing Mr. Seiler gave the following account (see Transcript pp. 48 et seq.):

He received the file in this case from the firm of Howard & Racz in the Summer of 1994. After finding a reference to Higgs in the file, he contacted Molly Howard, an attorney who had previously spoken with Higgs and memorialized her impressions in a memo that has been submitted to the Court. Ms. Howard told Mr. Seiler that Mr. Higgs could provide evidence favorable to the Defendants.

Mr. Seiler contacted Mr. Higgs in July, 1994, and spoke with him by phone. Higgs

---

5. The Court is not swayed by Defendants' procedural argument that Plaintiffs' motion for sanctions was inappropriate from its inception because Plaintiffs failed to file a certificate with the Court pursuant to Local Rule 26.7. That Rule requires a party to file with the Court, along with any objection or motion regarding discovery abuse, a statement certifying that it has conferred in good faith with opposing counsel regarding any discovery disputes. Plaintiffs did not submit such a certificate in this case. The deficiency is not significant, however. It is clear that the parties conferred frequently, by letter and otherwise, in the time before filing of Plaintiffs' motion to strike.

6. Plaintiffs' allegations of witness tampering and lying in open court are dealt with in part II.D, *infra*.

came to the offices of Seiler's firm, spoke to Seiler, and reviewed notes Seiler had made from phone conversations with Ms. Howard and Higgs himself. They also reviewed the police report and photographs from the accident. Mr. Seiler then told Higgs that he would draft a statement for Higgs to sign, and if it was somehow unsatisfactory, Higgs could make changes before signing it. He informed Higgs that the statement was only for "mutual reference between the two of us," and that he had no intention of filing it with the Court.

Seiler drafted the affidavit and left it with his secretary, who would give it to Higgs to sign when he stopped by to do so. The secretary left the affidavit at the reception desk, and on August 5, 1994, Higgs arrived to sign it. By coincidence, Seiler met Higgs as he came in; Seiler picked up the affidavit, gave it to Higgs, and instructed him to "[s]it down, read it, note any corrections, and we'll get it retyped." Trans. at 53. Higgs, in a hurry to return to work, stood at the desk reviewing the document. He told Seiler that the address was wrong and that there were two statements in the affidavit describing events Higgs did not see.

Seiler and Higgs began to discuss the two statements, and Higgs said "Well, wait a minute. I see in here that you've already said that I could not see what happened on the other side of the truck." Seiler implied from this that Higgs, having noted this caveat in the affidavit, now accepted it as phrasing Higgs' impressions and conclusions about the accident in a particular way instead of attributing to Higgs knowledge that he did not in fact have. Seiler then told him that they would correct any problems with the affidavit then and there, but Higgs assured him that no corrections were necessary. Higgs then, uninvited by Seiler, signed the affidavit, saying "[t]his is fine as long as we both have an understanding of what I could see from where I was before the accident and what I could perceive after the accident." Trans. at 55. Seiler responded that he understood Higgs' conditions and that they could go over the affidavit again at a later time.

Before leaving, Higgs requested a copy of the affidavit. Seiler says that his secretary then took the statement to another room to photocopy it. Before doing so, however, she noticed that Higgs had signed the statement, so she notarized it before copying it.

Seiler told Higgs that the affidavit was attorney work product and should not be distributed to the opposing parties. Seiler maintains that the affidavit was merely a draft and was never intended as anything but a tool for his own use during the course of the Knox litigation. *E.g.*, Trans. at 64. The affidavit was not provided to Joe Burton, an expert whom Seiler consulted on the case, even though Dr. Burton was given most of the other evidence available to Defendants. *See* Letter from Burton to Seiler, Oct. 14, 1994.

In late August, 1994, some time after the affidavit was drafted and signed, Seiler says that Mr. Scheer, in response to interrogatory answers filed by Seiler, contacted Higgs about the accident. Higgs faxed a copy of his affidavit to Scheer. On November 16, 1994, when Seiler took the deposition of Scheer's expert witness, Seiler says that he was shocked to find that the expert had a copy of Higgs' affidavit. In late November Seiler was notified that Scheer would be deposing Higgs on the 30th of that month. Seiler then called Higgs about the upcoming examination. Higgs told Seiler that he had no problem being questioned about the affidavit, and would be sure to explain to Scheer its contents and the circumstances under which it was written.

Seiler maintains that Higgs' responses during the deposition, discussed below, bear out Seiler's version of the events leading up to its signing and notarization. He also draws the Court's attention to a second affidavit provided by Higgs, taken in December, 1994, that is supportive of Seiler's contentions here. The affidavit was taken expressly for the purpose of defending Mr. Seiler against Mr. Scheer's accusations.

### 2. Court's Conclusions

Mr. Scheer's claim against Mr. Seiler is based on Higgs' deposition testimony. The Court finds the deposition to be the most credible evidence available on this subject.

Before the deposition Scheer suspected that Higgs' affidavit was inaccurate, because Higgs had mentioned something to that effect on the telephone. Higgs then discussed the matter when questioned under oath. The Court sees no reason not to take Mr. Higgs at his word. He had no interest in the case and no motivation either to deceive Mr. Scheer or to hurt Mr. Seiler.

Because Higgs is credible and the deposition is central to both parties' allegations, the Court quotes it at length. This deposition, combined with certain other evidence discussed below, shows that the affidavit contained falsehoods, not "impressions," and that Mr. Seiler did not use it only as a "draft," never to see the light of day. Seiler a) knew that it contained false statements, and b) was not forthcoming with this information, despite knowing that others were relying on the affidavit.

The relevant portions of Higgs' deposition testimony appear below.

MR. SCHEER: I believe you told me that you never really saw the bicycle, did you?

MR. HIGGS: No.

Q: I'm sorry. Did you?

A: No. I didn't see it.

. . . .

Q: Never saw her at all; is that correct?

A: That's correct.[7]

. . . .

A: . . . I had—after I had talked to you and you pointed out how this [affidavit] read, I immediately called [Seiler] up and reminded him that when I signed the affidavit, that I pointed out there were things I didn't say in here, and he said "We can change them now, or we can leave them like that." I said "Well, just as long as you know if it gets any further that I will say that I didn't say that." And he just said "We'll just leave them for now."

. . . .

Q: The affidavit says, "But a northbound bicycle," on the last page of paragraph three, "on Martin Luther King at-

tempted to pass the truck on the right side and the bicycle collided with the truck." Now, you never actually saw the bicycle?

A: No. And that is one of the things I pointed out, that I didn't say that, that Sonny Seiler told me that; that was the result of a police investigation. . . . And I said, "I didn't say that, because I couldn't see it." It says it right there [in paragraph three of the affidavit].

Q: Then on paragraph six of the affidavit, it says, "It appeared to me that she may have been trying to beat the truck through the intersection and was going too fast to avoid striking the side of the tractor trailer rig." Is that correct?

A: That is not correct. I didn't say that. . . .

. . . .

Q: Okay. And you never said, "It appeared to me that she may have been trying to beat the truck through the intersection and was going too fast to avoid striking the side of the tractor-trailer"?

A: No. I never said that.

Q: Okay. Also on paragraph seven of the affidavit, you state that—the affidavit states, I'm sorry, that "the truck did not hit the girl, rather, the girl's bicycle ran into the truck." That's not true, is it?

A: No. That's what Sonny Seiler told me the police said. I, in no way, even talked about that.[8]

On the signing of the affidavit, Higgs testified as follows:

Q: And then you went to the law firm of Bouhan, Williams and Levy, I assume, to sign the affidavit; is that correct?

A: That's correct.

Q: And when you signed the affidavit, did you notify either Mr. Seiler or anybody at that office that there were material misstatements in the affidavit?

. . . .

A: Yes.

Q: And was Mr. Seiler there?

A: Yes, he was.

. . . .

Q: Did you tell him at the time that you did not say that?

A: That is correct. I said, "I didn't say this."

Q: And he told you—did he tell you that it could be corrected later?

A: No. He left it up to me.... Then I said, "There's two things in here that I didn't say." And I told him why I didn't say it. And he says, "Well, we can change them now, or we can just leave them like that." I said, "Well, I don't care either way if it doesn't affect me." I didn't want to have to go back, take off work again, and re-sign it over this if it wasn't important. And I said, as long as he was aware that if it got any further, that I would say I didn't say that, you know, I didn't care. And he said, "Well, we'll just"—we left it like that. So it was basically my decision not to make the correction right then.[9]

Mr. Mulherin then examined Mr. Higgs, first to establish exactly what sections of the affidavit were disputed, and then as follows:

MR. MULHERIN: Okay. Do you know what information Mr. Seiler had available to him when he had this affidavit prepared? Did he tell you what he had been looking at and what he had been—

MR. HIGGS: When he was talking to me about this, basically, you know, getting the affidavit, he showed me a big diagram of the intersection and all the photographs, because one of them I'm in the photograph. So I looked at the photos and I looked at the diagram and he explained to me what the police had done and that, you know—the lawsuit and all that.

. . . .

Q: Do you remember, in your conversations with Ms. Howard, telling her that the bicyclist appeared to be going straight across the intersection?

A: I don't remember. I may have. That's still my opinion.

Q: Okay. Do you remember telling her that you thought that the bicyclist was probably going to go to the SCAD building on the other side of Bay Street?

A: Yeah. I said that.

. . . .

Q: Do you remember telling Ms. Howard that you thought that the bicyclist had made a bad decision?

A: I probably said that because I still stand by that. I don't think anybody would intentionally run into a truck.[10]

Mr. Scheer re-examined Higgs:

Q: Mr. Higgs, on page one of the affidavit, paragraph three, beginning, "But a northbound bicycle on Martin Luther King attempted to pass on the right and the bicycle collided with the truck," you never saw that, did you?

A: Well, it says right there, "At a point which I couldn't actually see." Yeah, I never said—I qualified it there a little bit.

Q: But you never even saw the bicycle?

A: No, not really.[11]

\* \* \* \* \* \*

a. The Drafting of the Affidavit

These excerpts lead the Court to a few conclusions. It is clear to the Court that Mr. Higgs never saw the bicycle. Thus, paragraph three contains a false statement. It says, in full,

From where I was stopped I could not see the right turn signals because they were on the other side of the trailer, but a northbound bicycle on Martin Luther King Boulevard attempted to pass the truck on the right side and the bicycle collided with the truck at a point which I could not actually see from where I was stopped.

During questioning, Mr. Scheer twice quoted this paragraph and twice left out the qualifying phrase at the end, "at a point which I could not actually see from where I was stopped." *See* Dep. at 9, 25. Both times Higgs noted that he had "qualified it there a little bit," but the paragraph still tells the reader that Higgs saw that bicycle, saw it travelling northbound, and saw it attempt to pass the truck. The qualifying phrase only

9. Dep. at 12–14.

10. Dep. at 19–20.

11. Dep. at 25.

implies that he did not see the very point of collision. There is nothing in the paragraph even vaguely implying that this account is merely an "impression," or the culmination of logical deductions by Higgs from circumstantial evidence at the scene. It is the testimony of a person who witnessed an event. Mr. Seiler knew that Higgs witnessed no such thing, but drafted the paragraph three as if he had.

As for the rest of the affidavit, paragraph six says in part, "It appeared to me that she may have been trying to beat the truck through the intersection and was going too fast to avoid striking the side of the tractor-trailer rig." Paragraph seven says, in part, "The truck did not hit the girl, rather the girl's bicycle ran into the truck." In the deposition excerpt above, Higgs flatly denies making either of these statements. His denials show the Court that it never "appeared" to him that Ms. Knox was trying to beat the truck through the intersection, and that he never saw the bicycle "run into the truck," instead of the reverse.

These discrepancies are not quite as disturbing as those in paragraph three, above. After reviewing both the memorandum by Molly Howard about her discussions with Higgs, and Higgs' responses to Mr. Mulherin's questions at the deposition, the Court finds that a lawyer, aggressively pursuing his trade, could draft paragraphs six and seven of Higgs' affidavit as Mr. Seiler did without knowingly committing an ethical breach. All jurists know that the line between advocacy and falsehood is blurry. Lawyers pursue many cases and within each and every case the opportunities for crossing the line are many. Lawyers, both plaintiffs and defendants, in daily competition, will often position themselves as close to that line as possible; it is for the Court to sift the facts from strategic characterizations and word choices, and to carefully decide what is good lawyering and what is fraud.

Paragraph three is a blatant falsehood of which Seiler was aware. Paragraphs six and seven could be intentional misstatements or merely advocacy, based on Higgs' opinion of Ms. Knox's actions, the police report, photographs, and diagrams. At the disciplinary hearing Mr. Hartridge drew the Court's attention to *Resolution Trust Corp. v. H.R. "Bum" Bright,* 6 F.3d 336 (5th Cir.1993), and while it is not dispositive of all issues raised by Higgs' affidavit, it illustrates the subtleties inherent to these situations. In that case, lawyers for Resolution Trust interviewed a former employee of the defendant and then drafted an affidavit for her signature. Upon reviewing it, she made several changes. The lawyers aggressively questioned her in an effort to convince her to accept their view of the case and sign a remodified affidavit that reflected that view. The lawyers persisted for some time, ultimately to no avail. The district court sanctioned them for attempting to "get a key witness ... to commit to a sworn statement that they knew contained assertions of fact she had not made," 6 F.3d at 340, and trying to "manufacture" evidence.

The Fifth Circuit disagreed, however, and found unobjectionable the circumstances surrounding creation of the affidavit. It distinguished between asking a witness to swear to facts which are known to be false and aggressively trying to persuade a witness that her "initial version of a certain fact situation is not complete or accurate." *Id.* at 341. But it further noted that "while the attorneys were persistent ... they nevertheless made sure that [the witness] signed the affidavit only if she agreed with its contents." *Id.* at 342.

These comments are useful here, in that they illustrate an important distinction. There is minimal evidence of bad faith by Mr. Seiler in drafting the statements in Higgs' affidavit. There is substantial evidence, however, that Mr. Seiler acted in bad faith by allowing Mr. Higgs to *sign* the affidavit.

### b. The Signing of the Affidavit

As is fairly clear from Seiler's account and crystal clear from Higgs' deposition testimony, Seiler allowed Higgs to sign the affidavit even though Higgs disagreed with its content. No, Seiler did not pressure Higgs to sign it, and the Court accepts Seiler's claim that he told Higgs to correct the affidavit as necessary. Higgs, however, a layperson, was unaware of the significance of a signed

affidavit in a court of law, and signed the document without correction, believing it sufficient to simply tell Mr. Seiler that, (according to Mr. Seiler's account), "[t]his is fine as long as we both have an understanding of what I could see from where I was before the accident and what I could perceive after the accident." What Higgs could not know was that this action was not "fine." Mr. Seiler relied on Higgs' lack of knowledge concerning the use of signed affidavits, and Higgs' desire to return to work as soon as possible, as a means of securing Higgs' signature on a false affidavit without having to ask him for it.

Seiler acted by omission; he had a professional obligation to prevent Higgs from signing that affidavit when he realized Higgs disagreed with it but would sign it anyway. Instead Seiler helped the process along by telling Higgs, "Well, we can change them [two statements in the affidavit] now, or we can just leave them like that." Dep. at 13. Why would Seiler ever say this to Higgs unless he hoped Higgs would sign the document? The rest of Higgs testimony here is illuminating. He told Mr. Seiler, "Well, I don't care either way if it doesn't affect me," and then explained,

> I didn't want to have to go back, take off work again, and re-sign it over this if it wasn't important. And I said, as long as he was aware that if it got any further, that I would say I didn't say that, you know, I didn't care. And he said, "Well, we'll just"—we left it like that. So it was basically my decision not to make the correction right then.

It was indeed Mr. Higgs decision to "not make the correction right then," but he could not have known, as Seiler did know, that Seiler was obliged to dissuade him if the affidavit contained statements both men knew were false.

Seiler argues that the affidavit was merely a "draft," for "mutual reference only," and never intended for official use. As evidence of this, he says that he told Mr. Higgs this at the time of signing, and also notes that the

affidavit was not given to a defense expert, Dr. Burton, for use in writing his report, even though the expert was given most other documents related to the case.

The Court does not believe Mr. Seiler's explanation of the intended use of the affidavit. First, the document is not just signed, it is notarized. One does not notarize "drafts," especially those known to contain statements with which the affiant does not agree. Seiler claims that his secretary, without his permission or knowledge, notarized the document before photocopying it. Even if this is true, Seiler should have taken steps to rectify the situation the moment he realized his secretary's error. Instead, he said and did nothing. Then, in an October 17, 1994, response to a discovery request for the names of all persons interviewed by defense counsel, Mr. Mulherin listed David Higgs in his answer and wrote the following:

> Mr. Higgs was interviewed (apparently over the phone) on May 1, 1994, by Molly Howard. To this Defendant's knowledge, no formal statement, per se, was taken, but a memo to the file was generated memorializing the conversation. Mr. Higgs was also subsequently interviewed by Mr. Seiler in early August, 1994. *As a result of this interview, a sworn statement composed of the words of defense counsel based on the interview was prepared and reviewed and signed by Mr. Higgs.*

If the affidavit was a "draft," for "mutual reference only," and it was "accidentally" notarized, why did Mr. Mulherin state, in a discovery document bearing his signature, that he and Mr. Seiler had a "sworn statement" from Higgs, signed only after Higgs "reviewed" it? [12] There is nothing in this discovery response to reveal the statement's true nature, and the Court is confident that had it never come to light, defense counsel never would have volunteered it.

Nor did defense counsel ever voluntarily reveal the fact that the affidavit did not reflect Higgs' recollections or that Higgs did not agree with the statements therein. Mr.

---

12. In addition, the affidavit was apparently never even referred to as a "draft" by Messrs. Seiler or Mulherin before the April 5, 1995, disciplinary hearing, where they were called to account for its creation and signing.

Scheer, having earlier received a copy of the document from Higgs himself, gave it to his own expert, David Brown. *When Mr. Brown was deposed by defense counsel on November 16, 1994, they realized that he had reviewed Higgs' affidavit, but counsel said nothing, choosing to allow Mr. Scheer and the expert to continue to believe that the affidavit was accurate and sworn to by Higgs.* Trans. at 23; Brown Dep. at 114, 117–18. Yes, Mr. Seiler may have "liked to fell out of his chair" upon finding that the affidavit had been released to the Plaintiffs, Trans. at 60, but he said nothing about its inaccuracies. While they would have come out at trial if Mr. Higgs were examined, they also could easily have been used to influence settlement negotiations or support a motion for summary judgment, and no one would have been the wiser.

In further support of his position Mr. Seiler presents a second affidavit from Mr. Higgs, taken on December 13, 1994. The Court does not accord much weight to it. Aside from the fact that the affidavit was taken expressly to assist Mr. Seiler's defense against Mr. Scheer's charges, there is obvious irony in asking the Court to rely on an affidavit as proof of Mr. Seiler's good faith conduct regarding another affidavit. This second submission also does not absolve Mr. Seiler of responsibility for the notarization and use of Higgs' first affidavit *after it was taken;* it merely reinforces elements of both Seiler's and Higgs' descriptions of how the first affidavit was drafted and signed. It attests that Mr. Seiler did not attempt to convince Mr. Higgs' to swear to seeing events he in fact did not, but the Court has already accepted Mr. Seiler's word on that point. It also notes that some of Higgs' impressions of the accident in the first affidavit "are based primarily on my view of the scene after the collision occurred, and not what I saw at the time of the incident as I sat in my car stopped in traffic." 2d Higgs Affid. ¶ 12. If only Mr. Seiler had not omitted this minor detail the first time around.

Lawyers practicing before this Court are bound by the American Bar Association's Model Rules of Professional Conduct. *See* Local Rule 505(d). The Rules contain provisions requiring candor in dealings with opposing counsel and the Court. *E.g.,* MRPC 3.3. The ABA Standards for Imposing Lawyer Sanctions state that

> Suspension is generally appropriate when a lawyer knows that false statements or documents are being submitted to the court or that material information is improperly being withheld, and takes no remedial action, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding.

ABA Std. 6.12. *Cf.* MRPC 3.3, at Comment [4] ("When evidence that a lawyer knows to be false is provided by a person who is not the client, the lawyer must refuse to offer it regardless of the client's wishes."). Seiler knew that Higgs' affidavit was false and knew that it had entered the stream of litigation, even if not by his own hand. If the true nature of the affidavit and the true circumstances of its signing had never been revealed, the document surely would have hurt Plaintiffs' settlement negotiations and prospects for defending against a summary judgment motion. While the Court does not find suspension from the practice of law an appropriate sanction in this case, see part III.B, *infra,* these provisions, as well as common sense, make clear the impropriety of Mr. Seiler's conduct in this matter.

### C. The Judge Pro Tem

Mr. Scheer also accused Roland's of failing to disclose another pending lawsuit involving Hayes. Some time before the incident with Knox, Hayes' truck collided with a motorist on Bay Street; Hayes and his employer, Roland's, later sued. It appears from the record, however, that this accident, along with the accident report, was disclosed to Mr. Scheer two weeks before he filed his motion to strike Defendants' answers. *See* Letter From Mr. Mulherin to Mr. Scheer, Sept. 13, 1994 (Exh. C to Def.'s First Response to Mtn. to Strike). That is early enough that the Court is not prompted to impute significant wrongdoing to Roland's Warehouse on that basis.

But there is a far more disturbing element of this other lawsuit. Plaintiffs discovered during their investigations for the instant case that a DUI citation against Mr. Hayes was dismissed by Judge Pro Tem William Dowell in August, 1993. *See* Pltf. Reply Brief, Oct. 18, 1994, Exh. C (criminal docket sheet from Recorders Court of Chatham County). The fact normally would be unremarkable, but at the time Mr. Dowell dismissed the citation against Hayes, which occurred under questionable circumstances, *Mr. Dowell was also representing Mr. Hayes in his suit over the automobile collision on Bay Street. Id.* Exh. D (complaint filed in that suit, signed by Mr. Dowell).

The Court has no jurisdiction over Mr. Dowell; an inquiry should be made by the appropriate state officials.

### D. Other Allegations

Mr. Scheer has made other allegations of misconduct, including harassment of and tampering with witnesses,[13] and a claim that Defendants' counsel lied to the Magistrate judge, in open court, about the first date on which they secured a copy of Mr. Hayes' driving record. None of these claims are sufficiently well supported to warrant the Court imposing any sanctions in response. It is unclear whether any misconduct occurred, and no reliable evidence has been provided to support the allegations.

### III. CONCLUSION

### A. Dispositions

The Court sees in the record a second motion to strike Defendants' pleadings. This motion is **DENIED.** Similarly, the Court sees no reason for Plaintiffs to bandy about accusations of subornation of perjury or other criminal wrongdoing; it will **DENY** any motions to amend the pleadings with criminal claims against Defendants' counsel in these discovery matters. The Court affirms the Magistrate's orders of September 16, 1994, and November 23, 1994, except to modify the

fee award to relieve Providence Washington of any responsibility for it. All objections to those orders or motions to reconsider them are hereby **DENIED.**

The April 6, 1995, motion by Messrs. Rominger and Stabell to enter a limited appearance in this matter on behalf of Defendant Roland's is **DENIED.**

Although Defendants' answers are not stricken, the Court, in light of the disciplinary hearing and the latest submissions of the parties, imposes further sanctions as listed below.

### B. Summary of Sanctions

■ The Court's authority to impose sanctions for discovery abuse arises from a number of sources, including 28 U.S.C. § 1927 (unreasonable or vexatious delay of proceedings) and Federal Rules of Civil Procedure 26 (certification of discovery disclosures) and 37 (failure to disclose or cooperate in discovery). *See generally Malautea v. Suzuki Motor Co.,* 987 F.2d 1536 (11th Cir.1993). With regard to the bad faith use of Higgs' first affidavit, the Court can act under its inherent authority to regulate the local bar. *See Carlucci v. Piper Aircraft Corp.,* 775 F.2d 1440, 1447 (11th Cir.1985) (courts can sanction "errant lawyers"). The Court realizes that inherent powers should be sparingly invoked, *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43, 111 S.Ct. 2123, 2132, 115 L.Ed.2d 27 (1991) (inherent powers should be exercised with "great caution") (citing *Ex Parte Burr,* 9 Wheat. 529, 531, 6 L.Ed. 152 (1824)), and will do so only upon a finding of bad faith conduct by counsel. *See Hutto v. Finney,* 437 U.S. 678, 689 n. 14, 98 S.Ct. 2565, 2573, n. 14, 57 L.Ed.2d 522 (1978) (courts may sanction party or attorney who shows bad faith). *See generally Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 257–59, 95 S.Ct. 1612, 1620–22, 44 L.Ed.2d 141 (1975) (discussing proper exercise of courts' inherent power to assess attorney's fees against counsel).

---

**13.** These witnesses included Karen Bovee and Michelle Hamilton, both of whom submitted affidavits. Considering the Court's recent experience with affidavits, it is not prepared to rely on

these documents as support for further sanctions against Defendants' attorneys. Opposing affidavits have also been filed contesting the claims set out in the statements of Bovee and Hamilton.

The sanctions imposed in this matter are as follows: *First*, as stated, the Court affirms the Magistrate's award of fees and costs to Plaintiffs in the amount of $7,416 for discovery abuses regarding Mr. Hayes' driving record. It is payable jointly and severally by Messrs. Seiler, Mulherin, and Defendants Roland's and Hayes. The Court reiterates that striking of Defendants' answers would have been an inappropriate sanction for Defendants' and their counsel's conduct in that matter. *Second*, for bad faith conduct involving Mr. Higgs' first affidavit, including a) incorporating both false and misleading statements in the affidavit; b) allowing Higgs to sign it when both Seiler and Higgs knew it was false; c) allowing the statement to be notarized; d) presenting it as a sworn statement in responses to interrogatories, with no indication either that it was a "draft," or that it had in fact not been sworn to; e) allowing opposing counsel and experts to rely upon it without informing them of its true nature; and f) instead of simply admitting the indiscretion to the Court, forcing it and opposing counsel to wade through countless filings and shifting excuses, the Court finds again that the drastic sanction of striking pleadings is not warranted.

Instead, the Court awards Plaintiffs the fees and costs of pursuing the matter through April 10, 1995, payable jointly by Mr. Seiler and his law firm. Plaintiffs will submit a proposed accounting of those fees and costs within ten (10) days of this Order. In addition, the Court hereby disqualifies Messrs. Seiler, Mulherin, and any other member of their law firm from representing Defendants in this case. The cumulative delay and annoyance caused by Defendants and their counsel has been impressive; while Defendants themselves should not be denied their right to defend the underlying suit, their attorneys have caused sufficient delay and expense that the Court is justified in removing them. Defendants have forty (40) days to secure new representation and acquaint them with the suit. All deadlines will be adjusted accordingly.

SO ORDERED.