**Affirmed and Opinion filed September 9, 2014.**



In the

# Fourteenth Court of Appeals

### NO. 14-13-00571-CV

## GAIA ENVIRONMENTAL, INC. AND AXL INDUSTRIES, L.L.C., Appellants

### V.

## JAMES B. GALBRAITH AND MCLEOD, ALEXANDER, POWEL & APFFEL, P.C., Appellees

**On Appeal from the 157th District Court
Harris County, Texas
Trial Court Cause No. 2011-26454A**

## O P I N I O N

Appellants Gaia Environmental, Inc. and AXL Industries, L.L.C. brought claims against appellees James B. Galbraith and McLeod, Alexander, Powel & Apffel, P.C. ("MAPA") for tortious interference with a prospective business relationship, tortious interference with an existing contract, civil conspiracy, and aiding and abetting. Gaia and AXL alleged that attorney Galbraith and his firm

MAPA, which had represented BP North America, Inc. in an underlying wrongful death lawsuit brought against both Gaia and BP, had threatened not to renew and to cancel Gaia's contracts with BP if a Gaia corporate deponent did not change his testimony related to whether the work performed by the deceased Gaia employee was covered by a particular Gaia-BP contract.

Galbraith and MAPA moved for summary judgment on multiple grounds. Among the theories for summary judgment, Galbraith and MAPA asserted the attorney immunity doctrine. Gaia and AXL responded that attorney immunity does not protect the criminal act of tampering with a witness. The trial court granted summary judgment.

On appeal, Gaia and AXL argue that the trial court erred in granting summary judgment. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

*The underlying lawsuit:* In April 2003, Gaia Environmental, Inc. and BP North America, Inc. entered into a Master Site Services Agreement for Gaia to perform environmental consulting services.[1] This agreement is also known as the Land Farm contract, and contains an indemnity provision whereby Gaia agreed to defend and indemnify BP against negligence claims. In October 2008, a Gaia employee was killed in an accident involving a backhoe on BP property.

On the day of the accident, BP retained Galbraith and MAPA to represent it. The deceased employee's family brought a wrongful death lawsuit against Gaia and BP. Gaia also retained counsel, which included Phillip D. Sharp, who at the time was with Bracewell & Giuliani. Galbraith contacted Sharp to tender the defense and indemnity of BP pursuant to the Land Farm contract, but Gaia had not

---

[1] Gaia entered into two additional contracts with BP Products North America in May 2008.

obtained any liability insurance.  BP defended itself in the lawsuit.

During discovery, a BP corporate deponent testified that the Gaia employee was working pursuant to the Land Farm contract at the time of his accident and that Gaia was in control of the operation.  One of Gaia's owners, William Householder, testified at his deposition that the work being performed by the employee was not covered under the Land Farm contract and that BP directed the Gaia employee's work.

*The alleged witness tampering incident:* On August 14, 2009, Galbraith called Sharp to discuss Householder's deposition, which had been taken in May 2009.  When asked, Sharp informed Galbraith that Householder had already signed the transcript and it had been returned to the court reporter.  Galbraith told Sharp that "people at BP" were very upset with Householder regarding what he had said about certain tasks falling within the scope of the Gaia-BP contracts.  Galbraith requested that Sharp read Householder's deposition transcript again and discuss it with Householder.  Galbraith stated that if Householder was not willing to change what he had said at his deposition, BP was not going to renew its contracts.

Sharp reviewed Householder's transcript, then called him.  Sharp and Householder agreed they would try to "sit down and talk through this" with Galbraith.  Although Householder and Sharp discussed the two sides' disagreement over the applicability of the Land Farm contract with a MAPA associate who also represented BP, Sharp never had any other follow-up with Galbraith about Householder's deposition.  Householder did not change his testimony.  Ultimately, the Gaia-BP contracts were not renewed.

*The current lawsuit:* In May 2011, Gaia and AXL Industries, L.L.C., an environmental consulting company which had been in negotiations to purchase

3

Gaia, filed suit against BP North America, Inc., BP, p.l.c., Galbraith, and MAPA.[2] Gaia and AXL brought breach of contract and fraud claims against the BP defendants; tortious interference with a prospective business relationship claims against all the defendants; tortious interference with an existing contract claims against Galbraith and MAPA; civil conspiracy claims against all the defendants related to the alleged tortious interference with a prospective business relationship; and aiding and abetting claims against Galbraith and MAPA for allegedly assisting the BP defendants with the alleged tortious interference with a prospective business relationship. Gaia and AXL alleged that BP and "its lawyer," Galbraith of MAPA, threatened Householder that, unless he changed his testimony that the work performed by the deceased Gaia employee was not covered under the Land Farm contract and that BP directed the Gaia employee's work, BP would not renew and would cancel its contracts with Gaia.

Galbraith and MAPA filed a motion for traditional summary judgment, arguing that: (1) Gaia's and AXL's claims were barred by attorney immunity as the alleged actions occurred while Galbraith and MAPA represented BP in the underlying lawsuit; (2) Gaia's and AXL's claims were barred by a lack of privity; and (3) Galbraith and MAPA never engaged in the alleged conduct. Galbraith and MAPA included an affidavit by Galbraith with their motion.

Gaia and AXL responded that summary judgment based on attorney immunity is not appropriate where an attorney has operated outside the bounds of the law, arguing that Galbraith and MAPA committed a violation of Texas Penal Code, section 36.05, Tampering with a Witness. Gaia and AXL specifically contended that Galbraith "intended to coerce Householder to testify falsely." Gaia

---

[2] Gaia and AXL also initially brought claims against RB Environmental, alleging that RB Environmental purchased Gaia and BP transferred the Gaia-BP contracts to RB Environmental. The claims against RB Environmental were nonsuited.

4

and AXL also argued that their claims were not barred by a lack of privity and that they raised a fact issue as to whether Galbraith and MAPA engaged in the alleged conduct. Gaia and AXL included an affidavit by Sharp with their response, as well as the transcript from Householder's deposition.

Galbraith and MAPA filed a supplement to their summary judgment motion, arguing that they did not engage in any criminal conduct, and attaching the transcript from Sharp's deposition as an exhibit. Gaia and AXL filed a supplemental response, arguing that based on reasonable inferences drawn in their favor, the trial court must deny summary judgment. Gaia and AXL attached excerpts from Sharp's deposition to their supplemental response.

The trial court granted Galbraith's and MAPA's motion for summary judgment without specifying the basis for its ruling. Subsequently, Gaia's and AXL's claims against Galbraith and MAPA were severed from the litigation, making the summary judgment final. Gaia and AXL timely appealed.

On appeal, Gaia and AXL argue that the trial court erred because none of the grounds asserted by Galbraith and MAPA can support summary judgment in their favor. Specifically, they contend that: (1) Gaia's and AXL's claims are not barred by attorney immunity, (2) their claims are not barred by a lack of privity, and (3) a genuine fact issue exists as to whether Galbraith and MAPA engaged in criminal conduct.

## II.    ANALYSIS

### A.    Standard of review

Our review of a summary judgment is de novo. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). When reviewing a summary judgment, we take as true all evidence favorable to the

5

nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). To be entitled to traditional summary judgment, a movant must establish there is no genuine issue of material fact so that the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Mann Frankfort*, 289 S.W.3d at 848. A defendant can establish that he is entitled to summary judgment as to a cause of action asserted against him by conclusively negating at least one essential element of the cause of action or conclusively establishing each element of an affirmative defense. *Am. Tobacco Co., Inc. v. Grinnell*, 951 S.W.2d 420, 425 (Tex. 1997). Here, Galbraith and MAPA sought to establish that they were entitled to summary judgment based on the affirmative defense of attorney immunity.

"[O]nce a defendant has filed a motion for summary judgment asserting [attorney] immunity and proving as a matter of law that the allegedly actionable conduct was undertaken in the legal representation of a third-party client, this court has required the plaintiff to either raise a fact issue as to whether that conduct was undertaken in the representation of a third-party client or plead sufficient facts to show that the plaintiff asserts one or more claims that fall within an exception to attorney immunity." *Lackshin v. Spofford*, No. 14-03-00977-CV, 2004 WL 1965636, at *3 (Tex. App.—Houston [14th Dist.] Sept. 7, 2004, pet. denied) (mem. op.) (citing *Chapman Children's Trust v. Porter & Hedges, L.L.P.*, 32 S.W.3d 429, 441–42 (Tex. App.—Houston [14th Dist.] 2000, pet. denied)); *see also Chapman*, 32 S.W.3d at 442 (reviewing plaintiff's allegations as to exception and concluding no fact issue raised); *cf. Reagan Nat'l Adver. of Austin, Inc. v. Hazen*, No. 03-05-00699-CV, 2008 WL 2938823, at *1, *9 (Tex. App.—Austin July 29, 2008, no pet.) (mem. op.) (burden shifts to plaintiff to plead and offer proof raising a fact issue that his suit falls within an exception to attorney immunity to avoid summary

judgment); *but see Toles v. Toles*, 113 S.W.3d 899, 911–12 (Tex. App.—Dallas 2003, no pet.) (defendant also must attack merits of claims purporting to be based on exception); *Mendoza v. Fleming*, 41 S.W.3d 781, 787 (Tex. App.—Corpus Christi 2001, no pet.) (defendant also has burden to conclusively negate alleged exception to immunity).

We must determine: (1) whether the summary judgment evidence conclusively proves that Galbraith's and MAPA's allegedly actionable conduct occurred during their legal representation of BP; and (2) if so, whether Gaia and AXL either raised a fact issue as to whether Galbraith and MAPA undertook the alleged conduct in their representation of BP or whether Gaia and AXL alleged sufficient facts in their petition to show that Galbraith's and MAPA's actions fall within the criminal offense of witness tampering—the exception so asserted. *See Lackshin*, 2004 WL 1965636, at *3.

The trial court's order does not specify the grounds for its summary judgment. Therefore, we must affirm the summary judgment if any of the theories presented to the trial court are meritorious. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003).

**B.    Attorney immunity**

Generally, an attorney in Texas owes common-law duties in regard to his provision of legal services solely to his clients and others in privity with the attorney. *See McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W.2d 787, 792 (Tex. 1999); *Alpert v. Crain, Caton & James, P.C.*, 178 S.W.3d 398, 405 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).  Texas courts have long held that attorneys cannot be held civilly liable for damages to nonclients, under any theory of recovery, for actions taken in connection with representing a client.  *Sacks v. Zimmerman*, 401 S.W.3d 336, 340 (Tex. App.—Houston [14th

Dist.] 2013, pet. denied) (citing *James v. Easton*, 368 S.W.3d 799, 802 (Tex. App.—Houston [14th Dist.] 2012, pet. denied)); *Alpert*, 178 S.W.3d at 405; *Bradt v. West*, 892 S.W.2d 56, 71–72 (Tex. App.—Houston [1st Dist.] 1994, writ denied).

The attorney immunity doctrine derives from a policy goal of protecting the public's interest in loyal, faithful, and aggressive representation by those in the legal profession, ensuring that attorneys may be free to fulfill their given duty to zealously represent their clients within the bounds of the law. *Chapman*, 32 S.W.3d at 440 (citing *Bradt*, 892 S.W.2d at 71). This rule recognizes that "[i]f an attorney could be held liable to an opposing party for statements made or actions taken in the course of representing his client, he would be forced constantly to balance his own potential exposure against his client's best interest." *Alpert*, 178 S.W.3d at 405.

Were an attorney to enter proceedings knowing that she may be sued by the other side's attorney for something she does in the course of representing her client, "such a policy would favor *tentative* representation, not the *zealous* representation that our profession rightly regards as an ideal and that the public has a right to expect." *Bradt*, 892 S.W.2d at 72. Likewise, any other rule would act as a "severe and crippling deterrent to the ends of justice" because litigants might be denied a full development of their case if their attorneys were subject to the threat of liability for defending their clients' position to the best and fullest extent allowed by law, and availing their clients of all rights to which they are entitled. *Chapman*, 32 S.W.3d at 440 (citing *Bradt*, 892 S.W.2d at 71).

This immunity applies even if the attorney's conduct is wrongful, frivolous, or lacks merit in the context of the underlying litigation. *Alpert*, 178 S.W.3d at 405–06; *Bradt*, 892 S.W.2d at 72; *see Chapman*, 32 S.W.3d at 441–42 ("Because

under Texas law it is the kind of conduct that is controlling, and not whether that conduct is meritorious or sanctionable, the trial court's decision to grant summary judgment on the Trusts' fraud and conspiracy claims against Porter & Hedges was proper."). To determine whether immunity attaches, courts focus on the type or kind of conduct in which the attorney is engaged to determine whether the conduct is actionable or merely conduct undertaken in the representation of the client. *Chapman*, 32 S.W.3d at 440–41; *see Alpert*, 178 S.W.3d at 406; *Bradt*, 892 S.W.2d at 72.

However, courts recognize that an attorney's protection from liability arising out of the representation of a client is not "without limits" or "boundless." *See Byrd v. Vick, Carney & Smith LLP*, 409 S.W.3d 772, 780 (Tex. App.—Fort Worth 2013, pet. filed); *Toles*, 113 S.W.3d at 911. For example, if a lawyer knowingly participates in fraudulent activities independent of the lawyer's representation of the client, the lawyer's actions are "foreign to the duties of an attorney." *Alpert*, 178 S.W.3d at 406–07; *see Poole v. Houston & T.C. Ry. Co.*, 58 Tex. 134, 137 (1882) (fraudulent assignment of bill of lading); *JJJJ Walker, LLC v. Yollick*, — S.W.3d—, No. 14-13-00161-CV, 2014 WL 2535272, at *9 (Tex. App.—Houston [14th Dist.] June 5, 2014, no. pet. h.) ("[I]t is well established that an attorney can be held liable for his own fraudulent conduct even though it was performed on a client's behalf."); *Likover v. Sunflower Terrace II, Ltd.*, 696 S.W.2d 468, 472 (Tex. App.—Houston [1st Dist.] 1985, no writ) (conspiracy to defraud purchaser of apartment complex); *see also Essex Crane Rental Corp. v. Carter*, 371 S.W.3d 366, 382 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (drafting fraudulent documents to evade lawful seizure of property by judgment creditor); *Querner v. Rindfuss*, 966 S.W.2d 661, 666, 670 (Tex. App.—San Antonio 1998, pet. denied) (fraud in connection with probate administration). Likewise, "[a]n attorney who

9

personally steals goods or tells lies on a client's behalf may be liable for conversion or fraud in some cases." *Chu v. Hong*, 249 S.W.3d 441, 446 (Tex. 2008). An attorney also could be held liable for an assault during a trial proceeding. *See Bradt*, 892 S.W.2d at 72. Attorneys also may be liable to nonclients for negligent misrepresentation, under certain circumstances, despite the absence of a general negligence duty to nonclients. *See McCamish*, 991 S.W.2d at 793–94.

At issue here is alleged criminal conduct.[3] Criminal conduct can negate attorney immunity. *See Rawhide Mesa-Partners, Ltd. v. Brown McCarroll, L.L.P.*, 344 S.W.3d 56, 60 (Tex. App.—Eastland 2011, no pet.) (immunity does not extend to criminal activity); *Reagan*, 2008 WL 2938823, at *3, *9 (plaintiff alleged billboards' removal was criminal offense piercing attorney immunity); *IBP, Inc. v. Klumpe*, 101 S.W.3d 461, 475–76 (Tex. App.—Amarillo 2001, pet. denied) (same where plaintiff alleged criminal conspiracy to commit crime of theft of trade secrets contained in confidential employment guides).

## C. Galbraith and MAPA met their initial summary judgment burden.

Attorney immunity is considered an affirmative defense. Therefore, Galbraith and MAPA had the initial summary judgment burden of establishing as a matter of law that their allegedly actionable conduct was undertaken in the course of their representation of and discharge of their duties to their client, BP. *See Lackshin*, 2004 WL 1965636, at *3; *Bradt*, 892 S.W.2d at 65–66, 71–72.

---

[3] In their petition, Gaia and AXL did not allege that Galbraith and MAPA committed fraud or negligent misrepresentation. Although Gaia and AXL stated in their summary judgment response that Galbraith and MAPA "committed criminal and fraudulent acts," they solely argued in their response that Galbraith and MAPA violated the witness tampering criminal statute. On appeal, although they additionally characterize Galbraith's and MAPA's conduct as "suborning perjury," Gaia's and AXL's counsel confirmed during oral argument that they only are arguing the criminal exception of witness tampering.

10

In support of their summary judgment motion, Galbraith and MAPA argued that attorney immunity applied where Gaia and AXL are attempting to sue them for alleged conduct that occurred while they were serving in their capacities as attorneys of BP in the underlying wrongful death suit. Galbraith and MAPA submitted an affidavit from Galbraith, wherein he stated that:

> MAPA and I were retained to represent BP Products North America, Inc. ("BP") in litigation brought against BP and Plaintiff [Gaia] arising from the death of . . . a G[aia] employee who was killed while working on a Land Farm operated by G[aia] and owned by BP (the "Underlying Lawsuit").

> Within a few days of the underlying incident, I spoke with G[aia]'s attorney tendering the defense and indemnity of BP in this claim, pursuant to the Service Agreement between BP and G[aia]. I sought the identity and contact information of G[aia]'s insurance carrier to contact them directly, as well. We learned that G[aia] never purchased the required insurance. As a result, BP was required to defend itself in the Underlying Lawsuit, and ultimately settled the case for a confidential amount.

> Neither MAPA nor I represented G[aia] and/or any of its agents, representatives, and/or employees in the Underlying Lawsuit or in any other capacity. G[aia] was at all times represented by its own counsel throughout the entirety of the Underlying Lawsuit, and all communications by me to G[aia] in that lawsuit were through G[aia]'s duly-appointed counsel.

> I never instructed or attempted to instruct G[aia]'s president, Bill Householder, to change his testimony in the Underlying Lawsuit in any way. I never threatened anyone that BP would terminate its contract with G[aia] if Mr. Householder did not change his testimony in the Underlying Lawsuit.

(Paragraph numbers omitted).

Our immunity analysis focuses on the conduct in which Galbraith and MAPA allegedly engaged. *See Chapman*, 32 S.W.3d at 440 (citing *Bradt*, 892 S.W.2d at 72). Here, Galbraith's and MAPA's summary judgment evidence

11

indicates that BP and Gaia mounted entirely separate defenses in the underlying lawsuit. The evidence indicates that this is because the Land Farm contract contained an indemnification provision whereby Gaia was required to defend and indemnify BP, but Gaia had not obtained such liability insurance. Galbraith's and MAPA's evidence also indicates that any alleged threatening communication occurred between one defense attorney and another defense attorney. There is nothing in the record to suggest that Householder was contacted directly by Galbraith or MAPA. This alleged conduct occurred in the course of discovery during the underlying lawsuit. Indeed, the topic of the alleged threat concerned the substance of Householder's deposition testimony and possible cancellation of the Land Farm contract. Householder had testified that the work being performed at the time of the accident forming the basis of the underlying lawsuit was covered under the Land Farm contract and that BP directed the work of the deceased Gaia employee. Although he denied it, Galbraith allegedly communicated that this testimony should be "changed" or BP would cancel its contracts with Gaia.

We must assume for summary judgment purposes that the alleged conduct took place. *See id.* at 442. The testimony, as alleged by Gaia and AXL, that Galbraith and MAPA allegedly wanted to be "changed" concerned Householder's understanding of whether the deceased Gaia employee's activities fell within the scope of the contract and whether BP exercised control. In other words, the tenor of Galbraith's alleged discussion with Gaia's counsel related to their respective clients' disagreement over questions at the very heart of BP's possible legal defenses[4] in the wrongful death lawsuit—defenses that Galbraith as BP's attorney

---

[4] The scope of work under a particular agreement is a matter of contract interpretation and thus a question of law for the court. *Gulf Liquids New River Project, LLC v. Gulsby Eng'g, Inc.*, 356 S.W.3d 54, 70 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (citing *MCI Telecomm., Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 650–51 (Tex. 1999)). Likewise, determining whether a contract provides for a right of control generally is a question of law. *Dow Chem. Co.*

12

had the right to interpose. *See Bradt*, 892 S.W.2d at 71; *see also Kruegel v. Murphy*, 126 S.W. 343, 345 (Tex. Civ. App.—Dallas 1910, writ ref'd) (attorneys have the right "to practice their profession, to advise their clients and interpose any defense or supposed defense, without making themselves liable for damages"). However, "an attorney does not owe a duty to the attorney on the other side to ultimately be correct in his legal arguments." *Bradt*, 892 S.W.2d at 73.

Further, as this court held in *Chapman*, an allegation of threatening to take legal action against a nonclient in the course of an underlying dispute falls within the realm of protected conduct as an act undertaken as part of the discharge of an attorney's duties to its own client. 32 S.W.3d at 441–42. Here, Galbraith's and MAPA's summary judgment evidence regarding the lack of insurance coverage indicates that BP and its counsel might harbor legitimate concerns about the continuing status of the Land Farm contract based on Gaia's potential breach of the indemnity provision, as discovered during the underlying lawsuit. Moreover, even if the assertion (or threatened assertion) of a client's legal rights, such as to terminate a contract, proves to be without merit or incorrect, the attorney immunity doctrine applies. *See Alpert*, 178 S.W.3d at 405–06.

We also must note that courts are hesitant to override the protection afforded by attorney immunity when the attorney's conduct concerns alleged improprieties occurring during discovery in the underlying lawsuit. For example, in *Mitchell v. Chapman*, the Dallas court of appeals upheld summary judgment based on attorney immunity where the plaintiff alleged that the opposing attorney withheld a key underwriting file essential to the plaintiff's recovery in two prior suits. 10 S.W.3d 810, 811–12 (Tex. App.—Dallas 2000, pet. denied). The *Mitchell* court concluded

*v. Bright*, 89 S.W.3d 602, 606 (Tex. 2002). And, while there may be underlying factual disputes regarding the various factors of control, ultimately the exercise of actual control also is a question of law. *See Tex. A&M Univ. v. Bishop*, 156 S.W.3d 580, 584–85 (Tex. 2005).

that the plaintiff had no cause of action against the attorney "because of the nature of their relationship in the earlier two suits" and because the plaintiff's "interests are outweighed by the public's interest in loyal, faithful, and aggressive representation by attorneys employed as advocates." *Id.* at 812 (citing *Bradt*, 892 S.W.2d at 71). Likewise, in *Sacks v. Zimmerman*, we upheld summary judgment in favor of the attorneys who had represented the defendants throughout the pendency of the plaintiff's lawsuit. 401 S.W.3d at 343. The plaintiff had amended her petition to add the defense attorneys as defendants, alleging they committed invasion of privacy by discussing her medical records and exchanging them with defense counsel in another lawsuit filed by the plaintiff. *Id.* at 340–41. However, this court concluded that the plaintiff had not identified any conduct that was fraudulent or entirely foreign to an attorney's duties and instead complained about "the type of [discovery] conduct in which attorneys routinely engage when zealously defending their clients." *Id.* at 342.

Under the circumstances presented in this case, Galbraith's and MAPA's alleged conduct falls within the realm of zealous and aggressive representation in discharging their duties to their client in the context of the underlying lawsuit. Based on the evidence submitted with Galbraith's and MAPA's motion for summary judgment, we conclude they have met their initial burden of establishing that their allegedly actionable conduct was undertaken in the course of their legal representation of their client BP in the underlying lawsuit. *See Lackshin*, 2004 WL 1965636, at *4; *Chapman*, 32 S.W.3d at 441–42; *Bradt*, 892 S.W.2d at 72.

**D.    Gaia and AXL did not raise a genuine issue of material fact as to whether the alleged conduct was undertaken by Galbraith and MAPA in their representation of BP.[5]**

---

[5] Gaia and AXL do not expressly argue that they raised a fact issue regarding whether the alleged conduct was undertaken during Galbraith's and MAPA's legal representation of BP in

14

In support of their summary judgment response, Galbraith and MAPA presented Sharp's affidavit and portions of Sharp's deposition, wherein Sharp discussed the particular phone conversation between Galbraith and himself about Householder's deposition testimony in the underlying lawsuit. They also presented Householder's deposition transcript.

However, their evidence fails to raise a fact issue that Galbraith and MAPA did not take the alleged actions as part of their legal representation of BP in the underlying lawsuit. Sharp's affidavit confirms that at the time of the phone call, Galbraith and MAPA represented BP in the underlying lawsuit whereas Sharp represented Gaia. Sharp confirms that the substance of the conversation concerned Householder's deposition transcript and its contents. According to Sharp, Galbraith, who had not attended Householder's deposition for BP, asked Sharp whether he had reviewed the transcript, and whether Householder had signed and returned it to the court reporter. Sharp also stated that Galbraith told him about BP's very negative reaction to Householder's testimony "regarding whether certain tasks, such as removal of pumps and hoses or dealing with water pumps generally, did or did not fall within the scope of Gaia's contracts with BP."[6] Galbraith then told Sharp to read the transcript again and discuss it with Householder. According to Sharp, "Galbraith mentioned that Gaia's contracts with BP were coming up for renewal at year end and said that if Householder was not willing to change what he had said in his deposition, BP was not going to renew those contracts."

the underlying lawsuit. Instead, they continue to focus their attack on the alleged criminal nature of Galbraith's and MAPA's actions. However, because Gaia and AXL submitted summary judgment evidence with their response, we review that evidence for a fact issue.

[6] In the course of being questioned about the Gaia-BP contracts, when asked whether it was his "view based on the contract that [he] signed that putting a temporary pump in place to accomplish what the permanent pump does would be a BP issue?" Householder replied, "It was certainly out of scope."

15

The excerpts from Sharp's deposition testimony provided by Gaia and AXL essentially track his affidavit. Again, Sharp disagreed with Galbraith's affidavit testimony that he had not requested that Householder change his testimony in the underlying lawsuit. Sharp remembered Galbraith requesting that Sharp "get together with Householder and you-all talk about this" and telling Sharp that "Householder needed to go back and look at his testimony, and that if he did not change it, BP would not renew those contracts." In other words, if Householder was "going to embrace that, or if he [was] not going to change that, with respect to whether or not the contract did or did not cover the work being done, that BP was going to nonrenew those contracts." Sharp testified that Galbraith "causally linked" Householder's reconsideration of "the applicability of the contracts" to the nonrenewal of those contracts.

Taking as true all evidence favorable to Gaia and AXL and indulging inferences and resolving doubts in their favor, we conclude that the evidence fails to raise a fact issue that Galbraith and MAPA did not make these statements as part of their legal representation of BP in the context of the underlying lawsuit and pursuant to their right to interpose their client BP's supposed defenses and rights. *See Lackshin*, 2004 WL 1965636, at *3; *Bradt*, 892 S.W.2d at 71.

**E. Gaia and AXL did not allege sufficient facts in their petition to show that Galbraith and MAPA committed witness tampering.**

Taking all of the factual allegations in Gaia's and AXL's petition as true, we must next decide if they alleged sufficient facts to show that Galbraith and MAPA committed a violation of the witness tampering criminal statute. *See Lackshin*, 2004 WL 1965636, at *4 (citing *Chapman*, 32 S.W.3d at 441–42). We conclude that Gaia and AXL have not alleged such facts to show that they are under the criminal exception to attorney immunity. *See id.*

16

The pertinent elements of the criminal offense of witness tampering are: (a) a person (b) with intent to influence a witness (c) coerces a witness (d) in an official proceeding (e) to testify falsely. Tex. Penal Code Ann. § 36.05(a)(1) (West 2011 & Supp. 2014). The element in dispute is (e) to testify falsely, and the question we must answer is whether an allegation that Galbraith sought to threaten or coerce Householder to "change his testimony" rises to the level of alleging that essential criminal element.

The Penal Code[7] does not define the term "to testify falsely." We have not located, nor have the parties directed us to, any prior judicial construction of the term "to testify falsely" in the context of the witness tampering statute.[8] So we turn to the common, ordinary meaning of that term. *See Olivas v. State*, 203 S.W.3d 341, 345 (Tex. Crim. App. 2006); *see also Clinton v. State*, 354 S.W.3d 795, 800 (Tex. Crim. App. 2011) (noting court's ability to consult standard dictionaries to determine "fair, objective meaning of an undefined statutory term"). To "testify" means "to give evidence as a witness." Black's Law Dictionary 1704 (10th ed. 2014); *see* Merriam Webster's Collegiate Dictionary 1291 (11th ed. 2003) ("to make a solemn declaration under oath for the purpose of establishing a fact (as in a court)"). "False" means "intentionally untrue." Merriam Webster's Collegiate Dictionary 451 (11th ed. 2003). To "lie" is "to tell an untruth; to speak .

---

[7] We have located other instances where statutes contain the term "testify falsely," "testifies falsely," or "testifying falsely." *See* Tex. Code Crim. Proc. art. 23.03(d) (West 2014) (Capias or summons in felony); Tex. Gov't Code Ann. § 508.048(d) (West 2012) (Subpoenas); 16 Tex. Admin. Code § 94.71(c) (2014) (Tex. Dep't of Licensing & Registration, Responsibilities of a Registrant: Equal and Fair Treatment); 19 Tex. Admin. Code § 157.1046(b)(1)(C) (2014) (Tex. Educ. Agency, Conduct and Decorum); 37 Tex. Admin. Code § 380.9551(c)(21) (2014) (Tex. Juvenile Justice Dep't, Level I Hearing Procedure). However, the respective codes do not define such term nor have we located any cases construing such statutory term.

[8] The one criminal case cited by Gaia and AXL concerned hypothetical conduct in the context of a claim of ineffectiveness and did not provide any analysis of the "to testify falsely" element of section 36.05. *See Kober v. State*, 988 S.W.2d 230, 233–34 (Tex. Crim. App. 1999).

. . falsely." Black's Law Dictionary 1062 (10th ed. 2014); *see* Merriam Webster's Collegiate Dictionary 717 (11th ed. 2003) ("to make an untrue statement with intent to deceive"). Thus, the plain language of the statute—"to testify falsely"—indicates that to commit witness tampering one must intend to and coerce a witness to provide intentionally untrue evidence, or to lie.

Here, the petition does not contain an allegation that Galbraith and MAPA threatened Householder that unless he provided intentionally untrue evidence or lied, BP would cancel its contracts with Gaia. Rather, Galbraith and MAPA allegedly threatened Householder that he should "change" his given testimony—that the work performed by the deceased Gaia employee was not covered under the Land Farm contract and that BP did not direct the work of such employee. To "change" means "to make different," "alter, modify," "transform, convert," or "to give a different position, course, or direction to." Webster's Third New International Dictionary 373 (1993). Liberally construing the petition, we presume that Galbraith and MAPA intended to coerce Householder to alter or convert his testimony or position to state that the work at issue was covered under the contract and BP did not direct the deceased Gaia employee's work.

However, while we acknowledge that Gaia and AXL did not necessarily have to use the magic word "lie" in their petition, even this liberal construction does not equate to an accusation that Galbraith and MAPA intended to coerce Householder into testifying falsely or lying. We take note that rule 3.04 of the Texas Disciplinary Rules of Professional Conduct, Fairness in Adjudicatory Proceedings, contains the same phrase "to testify falsely" as the witness tampering statute. Under rule 3.04, "a lawyer shall not . . . counsel or assist a witness to testify falsely . . . ." Tex. Disciplinary Rules Prof'l Conduct R. 3.04(b), *reprinted in* Tex. Gov't Code Ann., tit. 2, subtit. G, app. A (West 2008) (Tex. State Bar R.

18

art. X, § 9). In the quasi-criminal context of disbarment proceedings, the Fifth Circuit has explained under what circumstances rule 3.04(b) applies:

> It is one thing to ask a witness to swear to facts which are knowingly false. It is another thing, in an arms-length interview with a witness, for an attorney to attempt to persuade her, even aggressively, that her initial version of a certain fact situation is not complete or accurate.

*Resolution Trust Corp. v. Bright*, 6 F.3d 336, 341 (5th Cir. 1993). There, despite the allegation that the disbarred attorneys aggressively attempted to persuade a key witness "to adopt certain statements which she had not expressly made and which she refused to adopt," the Fifth Circuit concluded the trial court abused its discretion in ordering disbarment because it disagreed that the attorneys "were either making or urging the making of 'false' statements in violation of [rule] 3.04(b)." *Id.* at 341.[9]

We conclude that this situation falls more in line with the latter scenario from *Bright*. Here, Galbraith and MAPA did not ask Sharp to ask Householder to swear to knowingly false facts. Instead, Galbraith and MAPA attempted to aggressively persuade Sharp, allegedly via threat of legal action, that Householder should change his initial version of the fact situation at hand to align with their client BP's version. *See id.* at 341. Gaia's and AXL's allegation simply does not amount to pleading the requisite criminal element that Householder "testify falsely."

Therefore, we conclude that Gaia and AXL have not pleaded sufficient facts to place their claims within a criminal exception to the attorney immunity doctrine

---

[9] Although *Bright* concerned a witness interview that resulted in an affidavit, the Fifth Circuit noted were the witness "giving testimony at a deposition or at trial," the attorneys "would not be required to accept [the witness's] initial testimony at face value but would be able to . . . challenge her testimony or attempt to persuade her to change it." 6 F.3d at 342.

on which Galbraith and MAPA sought summary judgment. *See Lackshin*, 2004 WL 1965636, at \*5 (citing *Chapman*, 32 S.W.3d at 441–42). Because Gaia and AXL did not raise a fact issue as to whether the alleged conduct was undertaken during the representation of BP and did not allege sufficient facts in their petition to fall within the exception by showing that Galbraith and MAPA committed the criminal offense of witness tampering, we overrule the first issue and affirm the trial court's granting of traditional summary judgment. *See Knott*, 128 S.W.3d at 215; *Lackshin*, 2004 WL 1965636, at \*3.

## III.     CONCLUSION

Because the trial court properly could grant summary judgment on attorney immunity, we need not address Gaia's and AXL's other two issues regarding whether their claims are barred by privity and whether a fact issue exists as to Galbraith's and MAPA's allegedly criminal conduct.[10]  *See* Tex. R. App. P. 47.1. Accordingly, we affirm the trial court's judgment.


/s/          Marc W. Brown
             Justice


Panel consists of Chief Justice Frost, and Justices Donovan and Brown.

---

[10] In particular, because we conclude that Gaia and AXL have not sufficiently alleged facts supporting the "testify falsely" element to place their claims within the witness tampering exception to attorney immunity, we need not reach the parties' arguments as to whether the evidence raises a fact issue on such element.

20